## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| ------------------------------------------------------- x | |
| **STEVE KONAN and LEBENE KONAN,** x | |
| **d/b/a Konan Realty and Tax Service,** x | |
| x | |
| **Plaintiff** x | |
| x | **Case No. \_\_\_\_\_** |
| **v.** x | |
| x | |
| **AFT COMMERCIAL, LLC,** x | |
| **PAUL ALLEN** x | |
| **and LUCAS BESSEY,** x | |
| x | |
| **Defendants.** x | |
| ------------------------------------------------------- x | |

## <u>COMPLAINT</u>

Plaintiffs Steven Konan and Lebene Konan d/b/a Konan Realty and Tax Service (collectively, "Plaintiffs", "Konan" or the "Konans"), file the following as their Complaint against Defendants AFT Commercial, LLC ("AFT Commercial"), Paul Allen and Lucas Bessey (jointly and severally referred to herein as the "Defendants"). Plaintiffs, by and through their undersigned counsel, assert the following claims and causes of action against each of the Defendants:

## I.

## THE PARTIES

1.     Steve Konan and Lebene Konan are owners of an unincorporated association known as Konan Realty and Tax Service.  The Konans reside at 5902 Preston Oaks Rd., # 1104 in Dallas, Texas 75254.

2.     Defendant AFT Commercial owns and manages commercial and residential real estate properties throughout North Texas. It may be served with process by serving its registered agent, Yvonne Allen, at the offices of AFT Commercial located at 300 State Street, Southlake, Texas 76092-1245.

3.     Defendant Paul Allen ("Allen") is the chief executive officer of AFT Commercial.  He and his wife Yvonne Allen are co-managers of AFT Commercial. Allen can be served with process at the offices of AFT Commercial located at 300 State Street, Southlake, Texas 76092-1245.

4.     Defendant Lucas Bessey ("Bessey") is employed by AFT Commercial. He can be served with process at the offices of AFT Commercial located at 300 State Street, Southlake, Texas 76092-1245.

## II.

## JURISDICTION AND VENUE

5.  This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1367 in that (i) the claims asserted against Defendants under

42 U.S.C. §§ 1981 and 1982 are claims that arise under federal law; and (ii) the state law claims asserted herein  are so related to the federal claims asserted herein that they form part of the same case or controversy under Article III of the United States Constitution.

6.   Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) in that (I) all defendants are residents of this District; and (II) a substantial part of the acts and omissions which give rise to the claims asserted herein arose in this District.

## III.

## THE FACTS COMMON TO EACH COUNT

7.   Plaintiff was a long-standing tenant of the building located at 813 Brown Trail in Bedford, Texas (the "Building").

8.   Defendant AFT Commercial acquired ownership of the Building in 2019.  At the time AFT Commercial acquired ownership of the Building, Konan was occupying Suite 3 of the Building (the "Leased Premises") at a monthly rental rate of $600 per month.

9.   Defendants immediately demanded that Konan pay $700 a month to occupy the Leased Premises notwithstanding the fact that Konan had a binding lease agreement with AFT Commercial's predecessor which entitled Konan to possession and quiet enjoyment of the Leased Premises in exchange for a monthly

3

rental payment of $600 a month. Konan reluctantly agreed to the rental increase in order to establish a favorable relationship with the new landlord.

10.    When it came time for Konan's existing lease to be renewed for the calendar year 2020-2021, Defendants demanded a monthly payment of $1500 a month, an amount that would have increased Konan's monthly rental obligation by more than one hundred fifteen percent (115%).

11.    When Konan balked at the proposed increase, Defendants agreed to lower the monthly rental payment to $960 per month, an amount that was still a thirty-eight percent (38%) increase over the $700 a month that Konan had been paying.  Konan agreed to pay this amount on the condition that Defendants agree to include a provision in the new lease that would cap any rental increase upon a renewal of the Lease (as hereinafter defined) at no more than 10% per annum.  The parties agreed to memorialize the terms of the new Lease in a written agreement which contained, *inter alia*, the following terms:

    a.  Konan would have the right to occupy the Leased Premises for a term of 15-months, commencing on May 1, 2020 and ending on July 31, 2021;

    b.  The monthly rent would be $960 per month;

    c.  Section 1.9 of the Lease provided that it would be automatically renewed "with an understanding that the price may go up by 10%"

unless Konan gave notice of termination forty-five days prior to

Lease expiration:

> Auto-Renew: Tenant agrees to Auto-Renewal* unless written notice is given at least 45 days prior to lease expiration. Tenant will forgo deposit if the notice is not received on time.

> *Auto-renewal = when you consent to Auto-renewal you are agreeing to the most current AFT Universal lease terms and conditions (which can be found at our website www.aftcommercial.com/universal-lease), and any specific terms from your previous lease with an understanding that the price may go up by 10%.

d. In a separate paragraph of the same Lease, the parties agreed that,

at the end of the Lease term, any renewal of the Lease would

include a rental increase of "10%, or $96."

A genuine, true and correct copy of the Lease is annexed hereto as Exhibit A (the

"Lease").

12.    The Lease recited that the lessor was "AFT Commercial or its

nominee."  The Lease did not indicate that AFT Commercial was formed as a

limited liability company.   The Lease was signed by Defendant Bessey, as

"lessor", with no indication of his representative capacity.  The Lease also failed to

disclose in Bessey's signature block (or, for that matter, anywhere else), that AFT

Commercial was a limited liability company. At all relevant times, Defendant

Bessey was acting under the instructions and direction of Defendant Paul Allen.

13.    The Lease also provided that "Landlord covenants and warrants that upon performance by tenant of its obligations hereunder, landlord will keep and maintain tenant in exclusive, quiet, peaceable and undisturbed and uninterrupted possession of the leased premises *during the term of this lease*." AFT Commercial's Universal lease terms – the terms that governed the Auto-Renewed Lease – contained the same provision.

14.   Konan never gave any notice of an intention not to renew the Lease. Accordingly, on June 16, 2021, in accordance with the provisions of Section 1.9 of the Lease, the Lease was auto-renewed for another 15-month period at a monthly rental increase of $96 a month (the "Auto-Renewed Lease").

14.   Plaintiff Konan fully complied with all of Konan's obligations under the Lease.  Konan regularly paid rent on time (even during the COVID outbreak) and complied with all of other obligations imposed by Konan under the Lease.  In fact, Steve Konan went above and beyond what Konan was obligated to do by assisting Defendants in addressing various problems that other tenants encountered with the Building.

15.    On June 23, after the Lease had been "auto-renewed" and in direct violation of Defendants' obligations under the Lease, Defendant Lucas Bessey tendered to Konan what purported to be a "renewal lease" which called for Konan

6

to pay a monthly rental of $2059, a one hundred nineteen percent (119%) increase in Konan's monthly rent.

16.    Defendants demanded that Konan immediately execute a new renewal lease or vacate the Leased Premises notwithstanding the fact that the parties had already agreed in the Lease that the Auto-Renewed Lease was to take effect on August 1, 2021 at a rental increase of no more than ten percent (10%) [i.e. no more than $1,056 per month].

17.    Thus, during the short time that AFT Commercial owned the Building, (i) the Defendants first raised Konan's rent by sixteen percent (i.e. $600 per month to $700 per month), (ii) the Defendants then raised Konan's rent by 38% (i.e. $700 per month to $960 per month) and, finally, (iii) the Defendants attempted to raise Konan's rent by 119% (i.e. $960 to $2059 per month) even though a renewal on the terms set out in the Auto-Renewed Lease was already binding on the parties and, under the terms of the Lease and Auto-Renewed Lease, rent could only be increased by no more than ten percent (10%).

18.    Significantly, the auto-renewal provision in Section 1.9 of Konan's Lease is the same provision contained in every standard AFT Commercial lease – what AFT Commercial refers to as its "Universal Lease." In its Universal Lease, AFT Commercial commits to auto-renew every tenant's lease for another term of the same duration at an increase in rental rate of no more than ten percent. Yet, the

Defendants first increased Konan's rent by 38% (in the Lease) and then demanded that Konan sign a new lease for the year 2021-2022 at a monthly rental increase of more than one hundred and nineteen percent (119%).

19. Defendants did not treat any other tenant in the manner they treated Konan. They did not attempt to back out of any auto-renewed Lease with any tenant other than Konan. They did not demand that any other tenant pay a rental increase of the magnitude (119%) they purported to impose on Konan – a rental increase demand that was in direct violation of the terms of both the Lease and already-binding Auto-Renewed Lease. In fact, Konan is not aware that Defendants raised the rent of any other tenant located in the Building by an amount greater than ten percent. The vast majority of tenants in the Building received no rental increase at all or actually had their monthly rental payments decreased.

20. When Konan refused to execute the new lease presented by Bessey, and insisted that the Defendants honor their obligations under the Auto-Renewed Lease, Defendant Bessey, acting at the behest and on the instructions of Defendant Paul Allen, purported to terminate Konan's right to possess the Leased Premises.

21. Defendants informed Konan that he would be locked out of the Leased Premises if he did not vacate on or before September 1, 2021.

22. On information and belief, after Konan refused Defendants' demand that he execute a lease with a one hundred nineteen percent (119%) rental increase,

Defendants or their representatives informed certain of Konan's clients and certain of the other tenants in the Building that Konan was going out of business.

23.    Confronted with Defendants' threat to lock them out, and concerned that Defendants' actions would further interfere with their ability to conduct business, Plaintiffs Lebene and Steve Konan were left with no choice; they were forced to seek new space.

24.    At all relevant times, Defendant Paul Allen, a licensed realtor, was the Chief Executive Officer of AFT Commercial. Allen and his wife, Yvonne Allen, are the managers of AFT Commercial.

25.    Defendant Allen controlled Defendant AFT Commercial, and directed the actions of Defendant Bessey with respect to the Lease and the Auto-Renewed Lease. Defendants Allen and Bessey used AFT Commercial to perpetrate a fraud on Konan, to force an illegal "renewal lease" on Konan and to drive Konan from the Leased Premises and the Building, all for their direct personal benefit. Ultimately, Defendants forced Konan from the Leased Premises that Konan was legally entitled to occupy.

26.    At all relevant times, Defendant Lucas Bessey communicated with Konan regarding the Lease and the Auto-Renewed Lease on behalf of the Defendants. Bessey, in league with Defendant Paul Allen, knowingly and

deliberately took steps to force Konan from the Leased Premises and the Building in violation of Defendants' obligations under the Lease and Auto-Renewed Lease.

27.    Defendants AFT Commercial, Allen and Bessey illegally forced Konan from the Leased Premises because Lebene Konan and Steve Konan are black and of African descent.

28.    At all relevant times, Defendants Allen and Bessey controlled AFT Commercial and utilized that entity to perpetrate a fraud on Konan. Specifically, at the time the Lease was executed, Defendants knew they had no intention of honoring the ten percent (10%) cap on increase in rent upon renewal of the Lease. Defendants entered into the renewal cap only to fraudulently induce Konan to execute the Lease, something Konan would not have done had Konan been aware that Defendants did not intend to honor the ten percent (10%) cap on rental increase.

## COUNT I

## [AGAINST ALL DEFENDANTS FOR VIOLATIONS OF 42 USC § 1981]

29.    Plaintiff Konan repeats and realleges the allegations set out in paragraphs 1 through 28 above as if set forth in their entirety at this point in the Complaint.

30.    The Supreme Court has interpreted 42 U.S.C. § 1981 to forbid all forms of racial discrimination in the making and enforcement of private as well as public contracts. *Runyon* v. *McCrary*, 427 U. S. 160, 168, 174-175 (1976). Further, "§1981's prohibition against racial discrimination in the making and enforcement of contracts applies to all phases and incidents of the contractual relationship, ***including discriminatory contract terminations***." *Rivers & Davison v. Roadway Express, Inc.*, 511 U.S. 298, 114 S.Ct. 1510, 128 L.Ed.2d 274 (1994) [emphasis added].

31.    The actions taken by Defendants AFT Commercial, Allen and Bessey in this matter were motivated by a discriminatory purpose based on the race and ethnicity of Steve and Lebene Konan. Konan was singled out and treated differently from every other tenant in the Building.

32.    After increasing Konan's rent by thirty-eight percent (38%) for the fifteen month period ending on July 31, 2021, Defendants insisted that Konan execute a renewal lease that more than ***doubled*** Konan's monthly rental payment (i.e. a 119% increase) for the Leased Premises – ***all in direct violation of (I) their commitment under the Lease to raise Konan's annual rental by no more than ten percent and (II) their guaranty that Konan would have "quiet, peaceable and undisturbed and uninterrupted" possession of the Leased Premises under the***

***terms of both the Lease and Auto-Renewed Lease.*** No other tenant of the Building was subjected to such treatment.

33.    Defendants engaged in this misconduct knowing that they were already contractually bound to honor the terms of the Auto-Renewed Lease. The Defendants did this for the purpose of forcing Steve and Lebene Konan from the Leased Premises and the Building in violation of contractual rights that Konan had under both the Lease and the Auto-Renewed Lease.

34.    But for the fact that Steve and Lebene Konan are black people of African descent, Defendants would not have (i) refused to honor the Auto-Renewed Lease; (ii) demanded that Konan sign a renewal lease with a rental increase of more than one hundred nineteen percent (119%); and (iii) treat Konan differently than every other tenant in the Building. Their actions to force Konan from the Leased Premises were motivated by a desire to illegally remove Steve and Lebene Konan from the Leased Premises because they are black.

35.    Defendants wrongfully impaired Konan's right to make and enforce a contract in violation of Konan's rights under 42 U.S.C. § 1981. As a consequence, Defendants are jointly and severally liable to Konan for (i) compensatory damages and (ii) punitive damages in an amount to be established by the jury.

36.     Pursuant to 42 U.S.C. § 1988(b), the Konans are also entitled to recover from Defendants all costs, including reasonable attorneys' fees, they incurred in prosecuting this action.

## COUNT II

## [AGAINST ALL DEFENDANTS FOR VIOLATIONS OF 42 USC § 1982]

37.     Plaintiff Konan repeats and realleges the allegations set out in paragraphs 1 through 36 above as if set forth in their entirety at this point in the Complaint.

38.     Pursuant to 42 U.S.C. § 1982, "[a]ll citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property."

39.     Through their actions described above, the Defendants knowingly and intentionally deprived the Konans of their right to lease real property, and did so because they are black, all in violation of 42 U.S.C. § 1982.

40.     Accordingly, Defendants are jointly and severally liable to Konan for (i) compensatory damages and (ii) punitive damages in amounts to be established by the jury.

13

41.     Pursuant to 42 U.S.C. § 1988(b), the Konans are also entitled to recover from Defendants their costs, including reasonable attorneys' fees they incurred in prosecuting this action.

## COUNT III

## [AGAINST DEFENDANTS FOR BREACH OF CONTRACT]

42.     Plaintiff Konan repeats and realleges the allegations set out in paragraphs 1 through 41 above as if set forth in their entirety at this point in the Complaint.

43.     Defendants materially breached (i) the Lease; and (ii) the Auto-Renewed Lease by (A) demanding that Konan sign a renewal lease containing a 119% rental increase in direct violation of the terms of the Lease and Auto-Renewed Lease; and (ii) forcing Konan out of the Leased Premises notwithstanding the fact that both the Lease and the Auto-Renewed Lease contained an express covenant guaranteeing Konan quiet enjoyment of the Leased Premises for the full term of the Lease and Auto-Renewed Lease so long as Konan complied with the obligations imposed on Konan pursuant to the terms of the Lease and Auto-Renewed Lease.

44.     As a consequence of Defendants material breach of the Lease and the Auto-Renewed Lease, Konan has incurred actual damages in excess of $100,000.

14

45.    In addition, pursuant to Section 38.001 of the Texas Civil Practice & Remedies Code, Konan demands recovery of all attorneys' fees incurred by Konan in bringing and prosecuting this action for breach of contract against AFT Commercial.

## COUNT IV

## FRAUDULENT INDUCEMENT
## [AGAINST ALL DEFENDANTS]

46.    Plaintiff Konan repeats and realleges the allegations set out in paragraphs 1 through 45 above as if set forth in their entirety at this point in the Complaint.

47.    At the time Konan entered into the Lease, Defendants AFT Commercial, Allen and Bessey knew that they had no intention of honoring the following express promises made to Konan in the Lease and Auto-Renewed Lease: (i) to renew Konan's Lease at a rental increase of no more than ten percent (10%), as required under the auto-renewal provision of the Lease; and (ii) to uphold the covenant of quiet enjoyment with Konan.

48.    Had Konan known that Defendants had no intention of honoring these obligations, Konan would not have entered into the Lease.

49.    The Defendants intended that Konan rely on their false and fraudulent representations that the Lease would be renewed (indeed, auto-renewed)

at a rental increase of no more than ten percent and that Konan would have quiet enjoyment of the Leased Premises.

50.    Konan relied on Defendants' fraudulent misrepresentations; those misrepresentations were material and induced Konan to enter into the Lease and the Auto-Renewed Lease.

51.    Konan has suffered actual damage as the result of Defendants' fraudulently inducing Konan to enter into the Lease and Auto-Renewed Lease on the basis of promises the Defendants knew at the time they had no intention of honoring. Specifically, Konan was illegally forced out of the Leased Premises, and was forced to let new space at a much higher rental rate.

52.    Further, at the time Konan signed the Lease in May of 2020 there was ample rental space available in the DFW area at very cheap rents due to the ongoing COVID pandemic. Landlords were literally begging for paying tenants to lease space in their buildings.

53.    Had Konan been aware that Defendants had no intention of honoring the rental cap on renewal rental set out in the Lease, the auto-renewal provision of the Lease or AFT Commercial's covenant of quiet enjoyment, Konan would never have entered into the Lease. Instead of signing the Lease, Konan could and would have moved and leased alternative space under a long-term lease at a much more attractive rental rate than what Konan is paying now.

16

54.    As a consequence of the foregoing fraudulent inducement, Konan has suffered actual damages in the amount of at least $100,000.

## COUNT V

### [AGAINST ALL DEFENDANTS FOR VIOLATIONS OF THE TEXAS DECEPTIVE TRADE PRACTICES ACT]

55.    Plaintiff Konan repeats and realleges the allegations set out in paragraphs 1 through 54 above as if set forth in their entirety at this point in the Complaint.

56.    Steve and Lebene Konan d/b/a Konan Realty and Tax Service are "consumers" under the terms of the Texas Deceptive Trade Practices Act ("DTPA"). Tex. Bus. & Commerce Code, § 17.01, *et seq.*

57.    Defendants engaged in false, misleading or deceptive acts or practices with respect to their dealings with Konan.

58.    Defendants AFT Commercial, Allen and Bessey violated at least three "laundry list" provisions of the DTPA with respect to AFT's negotiation and failure to perform under the Lease.

59.    First, Defendants violated Section 17(b)(24) of the DTPA by "failing to disclose information concerning goods or services which was known at the time of the transaction if such failure to disclose such information was intended to induce the consumer into a transaction into which the consumer would not have

17

entered had the information been disclosed." Specifically, Defendants knew at the time that the Lease was negotiated and executed with Konan that they had no intention of honoring their commitments to Konan (as memorialized in the Lease) to (i) propose a rental increase on renewal of no more than ten percent (10%); (ii) abide by the terms of the Lease's auto-renewal provisions; and (iii) honor Konan's right to quiet possession of the Leased Premises.

60.    At the time the Lease was executed, Defendants knew they would not honor any of these commitments to Konan, but, instead, intended to force Konan out of the Leased Premises by insisting that Konan execute a renewal lease that more than doubled Konan's monthly rental payment.

61.    Defendants intended that Konan would rely on their false and material misrepresentations.  If Konan had known that Defendants did not intend to honor the representations and agreements set out in the Lease at the time they were made, Konan would not have entered into the Lease.

62.    Second, Defendants violated Section 17.46(b)(12) of the DTPA. Defendants represented that the Lease conferred or involved rights and remedies in favor of Konan that Defendants subsequently asserted the Lease did not contain. Specifically, Defendants asserted that Konan had no right to the Auto-Renewed Lease, and that Konan's only option to remain in possession of the Leased Premises was to execute a new lease that raised Konan's monthly rent by 119%.

18

63. Third, Defendants violated Section 17.46(b)(8) of the DTPA by "disparaging the goods, services, or business of another by false or misleading representation of facts." On more than one occasion, Defendants or their representatives, acting with the knowledge of Defendants Allen and Bessey, falsely informed Konan's clients that Konan was going out of business. Those statements were false, and Defendants knew they were false – but Defendants nevertheless deliberately set out to sabotage Konan's business relationships by making such false representations.

64. The foregoing violations of the DTPA were carried out knowingly and intentionally, and were motivated by fraud or malice with the specific intent to harm Konan and Konan's business; accordingly, Defendants are also liable for exemplary damages. Exemplary damages are particularly appropriate in this case because Defendant Paul Allen, AFT Commercial's CEO, is a licensed real estate agent working through the Keller Williams real estate firm. Accordingly, Allen knew full well that what Defendants were doing to Konan was illegal, wrong and in violation of the standards that apply to every licensed real estate agent.

65. As a consequence of the foregoing, Plaintiff Konan is entitled to recover (i) actual damages in the amount of at least $ 100,0000; (ii) additional damages in the amount of three times the actual damages awarded; and (iii) all

attorneys' fees and costs incurred in prosecuting the foregoing claims under the DTPA.

## COUNT VI

## [FRAUD IN CONNECTION WITH A REAL ESTATE TRANSACTION UNDER § 27.01 OF THE TEXAS BUSINESS & COMMERCE CODE]

66.     Plaintiff Konan repeats and realleges the allegations set out in paragraphs 1 through 65 above as if set forth in their entirety at this point in the Complaint.

67.     As set out above, Defendants promised Konan that the Lease would be renewed at a rental increase of no more than ten percent (10%), and that they would guaranty Konan's quiet enjoyment of the Leased Premises during the term of the Lease and the Auto-Renewed Lease so long as Konan did not violate his obligations thereunder.

68.     Konan did not violate the terms of the Lease or the Auto-Renewed Lease; to the contrary, Konan complied with all of Konan's payment and other obligations under the terms of those contracts.

69.     Defendants' promises were (i) material; (ii) made with the intention of not fulfilling such promises; (iii) made to Konan for the purpose of inducing Konan to enter into the Lease; and (iv) relied on by Konan in entering into the Lease.

70.    The foregoing misrepresentations were made with actual awareness that they were false at the time when made.

71.    As a consequence of the foregoing, Defendants are liable to Konan under Section 27.01 of the Texas Business and Commerce Code for the recovery of (i) actual damages; (ii) exemplary damages; and (iii) all reasonable and necessary attorney's fees, expert witness fees, costs for copies of depositions, and costs of court.

## CONCLUSION

WHEREFORE, PREMISES CONSIDERED, Plaintiffs pray that this Court issue citations to Defendants AFT Commercial, Paul Allen and Lucas Bessey, and enter judgment in favor of Plaintiffs and against Defendants, jointly and severally, awarding the following relief:

A.    Actual damages for Defendants' violations of 42 U.S.C. §§ 1981 and 1982;

B.    Exemplary damages in an amount equal to at least three times the amount of actual damages awarded for Defendants' violations of 42 U.S.C. §§ 1981 and 1982;

C.    Costs incurred in prosecuting the claims asserted above under 42 U.S.C. §§ 1981 and 1982, including reasonable attorneys' fees, pursuant to 42 U.S.C. § 1988(b);

D.    Actual damages against Defendants for breach of contract;

E.    Recovery of costs and reasonable attorneys' fees from Defendants pursuant to Section 38.001 of the Texas Civil Practice and Remedies Code;

F.    Actual and exemplary damages against all Defendants for fraudulent inducement;

G.    Actual and exemplary damages against all Defendants for fraudulently inducing Konan to execute and enter into the Lease;

H.    Actual damages for Defendants' violations of the Texas Deceptive Trade Practices Act;

I.    Additional damages for Defendants' violations of the Texas Deceptive Trade Practices Act in an amount equal to three times Konan's actual damages;

J.    Actual and exemplary damages for Defendants' violations of Section 27.01 of the Texas Business and Commerce Code;

K.    Recovery of all costs and attorneys' fees allowable under Section 27.01(e) of the Texas Business and Commerce Code; and

L.   Granting all other and further relief to which Plaintiffs may be justly entitled to receive.

## **JURY DEMAND**

Pursuant to Fed.R.Civ.P. 38, Plaintiffs demand a jury trial.

Respectfully submitted,

/s/ Robert Clary
Robert Clary, PLLC
State Bar No. 04325300
405 Windward Dr.
Murphy, Texas 75248
Phone: (972) 757-5690
Fax: (972) 692-8212

COUNSEL FOR PLAINTIFFS
STEVE AND LEBENE KONAN
d/b/a KONAN REALTY AND TAX
SERVICE

23

AFT Commercial

300 State Street • #93684 • Southlake, TX 76092
(682) 313-6364

# 1. Commercial Office Space Lease Agreement

## 1.1 AGREEMENT:

Between AFT Commercial or nominee and  Konan Realty and tax .

## 1.2 SUITE(S):

Landlord leases
 813 Brown Trail
 Bedford, TX 76022
Suite  3  to tenant with the covenants, conditions, provisions, and any addendums mentioned here.

## 1.3 TERM:

Landlord leases the stated premises to Tenant, and Tenant leases the same from Landlord for the following term of  15 months .

X _____*S K*_____
Konan Realty and tax

## 1.4 RENT:

Tenant shall pay to landlord  $960.00 . Each installment payment shall be due and payable on or before the first (1st) day of each calendar month during the lease term to landlord. Payment is to be submitted via the tenant portal through AppFolio. (https://passport.appf.io/ sign_in?idp_type=tportal&vhostless=true&waldo=true).

The ACH or e-check option takes 2 business days to leave tenant's bank account once initiated through the AppFolio Online Portal. It is tenant's responsibility to have funds available.

X _____*S K*_____
Konan Realty and tax

## 1.5 PRO-RATED RENT (IF APPLICABLE)

Pro-rated rent of    will be due at the time Lease Agreement is signed.

## 1.6 SECURITY DEPOSIT:

Tenant will remit a security deposit of  $700.00 . The security deposit shall be held by Landlord without liability for interest and as security for the performance by Tenant's covenants and obligations under this lease and will be returned within 30 days after lease termination minus deductions, if any. Upon exit of tenancy, $95 will be held from your security deposit for professional cleaning of your suite. If rent goes up the security deposit will also increase by the same amount unless otherwise stated.

## 1.7 LATE-RENTAL PAYMENTS:

Rent is due on or before the 1st of each month and considered late on the 2nd. A $75 charge will be issued on 2nd if rent is unpaid at that time. Any delay beyond the 2nd of every month shall attract a **$10 charge per day** for every delayed day this shall be over and above the **$75 late fee.** Landlord reserves the right to change the locks and or hold tenant property until payment has been satisfied. Landlord also has the right to terminate the tenancy and any Tenant possessions not removed by the end of the month may be disposed of by landlord and any additional disposal costs will be billed to the tenant.

*Ex. A*

X     *S K*
_____
Konan Realty and tax

## 1.8 NSF FEES:

There will be a **$50 NSF** fee for any funds returned unpaid.

X     *S K*
_____
Konan Realty and tax

## 1.9 RENEWALS:

Auto-Renew: Tenant agrees to Auto-Renewal* unless written notice is given at least 45 days prior to lease expiration. Tenant will forgo deposit if the notice is not received on time.

*Auto-renewal = when you consent to Auto-renewal you are agreeing to the most current AFT Universal lease terms and conditions (which can be found at our website www.aftcommercial.com/universal-lease), and any specific terms from your previous lease with an understanding that the price may go up by 10%.*

X     *S K*
_____
Konan Realty and tax

## 1.10 USE:

Notwithstanding the foregoing, Tenant shall not use the leased premises for the purposes of storing, manufacturing, or selling any explosives, flammables or other inherently dangerous substance, chemical, thing or device. The Tenant may use the office space rented out to them to conduct their business, but may not use common space without prior permission or agreement. Any illegal activity will not be tolerated and will result in the immediate termination of the lease. Tenant will be responsible for breaking the lease.

## 1.11 SUBLEASE AND ASSIGNMENT:

Tenant shall not sublease any part of the leased premises or assign this lease in whole or in part without landlord's consent.

## 1.12 TERMINATION:

Landlord reserves the right to terminate this lease at any time with a minimum 30-day notice of termination.

In the event of early termination by tenant, tenant remains responsible for all remaining payments as defined by the terms of the lease.

Failure to return keys, if applicable, will result in $50 charge to tenant.

## 1.13 C.O.'S AND PERMITS:

Landlord is not responsible for any city or state requirements that may infringe upon tenant's desire for use of the premises.

## 1.14 REPAIRS:

Tenants may modify the look of the space rented to them at their own cost. Modifications are limited to paint jobs/flooring. No structural changes allowed. (A written letter explaining the changes that are wanting to be done should be given to the property manager and after approval, these jobs can be executed). In case the tenant decides to terminate the lease within 6 months of these changes; tenants will be responsible to pay the Landlord the expense incurred to redo the space or revert to original paint color at their own cost. During the lease term, tenant shall make, at tenant's expense, all necessary repairs to the leased premises as a direct result of tenant's neglect, failure, or accidental damage. Repairs shall include such items as routine repairs of floors, walls, ceilings, and other parts of the leased premises

damaged or worn through normal occupancy, except for major mechanical systems or the roof, subject to landlord's approval. Tenant is also responsible for all expenses, maintenance and repairs of in-suite plumbing and fittings. **Any unkept appointments will incur a $75 fee.**



X _____ *S K* _____
Konan Realty and tax

## 1.15  INSURANCE:

All tenants may be required to obtain General Liability insurance for their business within a week of occupying the office space. If the leased premises or any other part of the building is damaged by fire or other casualty resulting from any act or negligence of tenant or any of tenant's agents, employees or invitees, rent shall not be diminished or abated while such damages are under repair, and tenant shall be responsible for the costs of repair not covered by insurance. Landlord shall maintain fire and extended coverage insurance on the building, but not for tenant's personal possessions, loss, theft, work-time lost, and all products related to that loss. Tenant shall be responsible, at its expense, for comprehensive general liability with respect to the respective activities of the work or services they provide; theft, fire, water damage, and extended coverage insurance on all its personal property, including removable trade fixtures, located in the leased premises. Tenant can choose to obtain an insurance policy but understands by signing this lease, Tenant waives any claim against the Landlord for all losses related to fire, theft, vandalism, acts of nature, or war.

## 1.16  UTILITIES AND OTHER SERVICES:

Where provided, tenant is responsible for all current and future individually metered utilities. Tenant shall not use any equipment or devices that utilizes excessive water or electrical energy use, or which may, in landlord's reasonable opinion, overload wiring or interfere with electrical or water services to other tenants. No installation of stoves or refrigerators without landlord's consent.

## 1.17  SIGNAGE:

Signage is only by expressed consent of Landlord. Tenants may display their business name on the door of the space. (Self adhesive stickers may be used)

## 1.18  ENTRY:

Landlord shall have the right to enter upon the leased premises at reasonable hours to inspect or modify. Landlord shall not thereby unreasonably interfere with tenant's business on the leased premises. Landlord must have keys and access to tenant's leased premises in the event of emergencies, repairs, and inspections. Landlord reserves the right to show leased space to prospective tenants up to 180 days prior to lease expiry.

## 1.19  PARKING:

Parking on the premises is only by express permission of the landlord. Landlord reserves the right to tow away any vehicles which inhibit the landlord or the tenant's use of the property. Cars are not permitted to stay in the parking lot overnight. Violations will be towed at owner's expense. Parking is at owner's risk, the landlord shall not be responsible/liable for any theft, damage, cost to tenant's or their patrons' vehicle while on the premises.

## 1.20  STORAGE:

Storage of hazardous chemicals or any other material that may be life threatening or damaging to the property, is strictly prohibited on the building premises. Storage of Unlicensed Firearms / Display of Firearms is strictly prohibited.

## 1.21  BUILDING RULES:

Tenant to comply with all rules and any amendments from landlord, city, state and any other authority and will cause all its agents, employees, invitees and visitors to do so.

## 1.22  COOPERATION:

As an integral part of this lease, it is understood by both parties that all occupants of the building are to cooperate with other ministries/businesses in order to be a blessing to each other and to the local and greater community. To this end, landlord reserves the right to hold mandatory meetings of all tenants to promote ministerial cooperation, pray for each other and to address any in-house issues that may occur.

## 1.23  . DEFAULT:

If default shall at any time be made by tenant in the payment of rent when due to landlord as herein provided, and if said default shall continue for three (3) days after written notice thereof shall have been given to tenant by landlord, or if default shall be made in any of the other covenants or conditions to be kept, observed and performed by tenant, and thereafter diligently prosecuted, landlord may declare this lease terminated by giving tenant a 3-day written notice of such intention, and if possession of the leased premises is not surrendered, landlord may re-enter the premises. Landlord shall have, in addition to the remedy provided above, any other right or remedy available. Landlord shall use reasonable efforts to mitigate its damages. Landlord reserves the right to change locks, cut power, and/or dispose of tenant possessions. **Landlord reserves the right and may choose to report any outstanding balances or charges owed to one or more credit bureau.**

X___*S K*___
Konan Realty and tax

## 1.24  QUIET POSSESSION:

Landlord covenants and warrants that upon performance by tenant of its obligations hereunder, landlord will keep and maintain tenant in exclusive, quiet, peaceable and undisturbed and uninterrupted possession of the leased premises during the term of this lease.

## 1.25  SUBORDINATION:

Tenant accepts this lease subject and subordinate to any mortgage, deed of trust of other lein presently existing or hereafter arising upon the leased premises, or upon the building and to any renewals, refinancing and extensions thereof, but tenant agrees that any such mortgagee shall have the right at any time to subordinate such mortgage, deed of trust or other lien to this lease on such terms and subject to such conditions as such mortgagee may deem appropriate in its discretion. Landlord is hereby irrevocably vested with full power and authority to subordinate this lease to any mortgage, deed of trust or other lien now existing or hereafter placed upon the leased premises of the building. Tenant agrees upon demand to execute such further instruments subordinating this lease or according to the holder of any such liens as landlord may request in the event that tenant should fail to execute any instruments subordinating this lease or according to the holder of any such liens as landlord may request in the event that tenant should fail to execute any instrument of subordination herein required to be executed by tenant promptly as requested, tenant hereby irrevocably constitutes landlord as its attorney-in-fact to execute such instrument in tenants name, place and stead. It being agreed that such power is one coupled with an interest. Tenant agrees that it will from time to time upon request by landlord execute and agrees that it will from time to time upon request by landlord execute and deliver to such persons as landlord shall request a statement in recordable form certifying that this lease is unmodified and in full force and effect (or if there have been modifications, that the same is in full force and effect as so modified). Stating the dates to which rent and other charges payable under this lease have been paid, stating that landlord is not in default hereunder (or if tenant alleges a default stating the nature of such alleged default) and further stating such other matters as landlord shall reasonably require.

## 1.26  KEYS AND SECURITY:

Any keys or entry cards which landlord lets the tenant use remain landlord's property at all times. The tenant must not make any copies of the key and/or entry cards or allow anyone else to use them without landlord consent. Any loss of keys or entry cards must be reported to landlord immediately and the tenant must pay a reasonable fee for replacement keys or cards and changing locks, if required. This rule improves security levels of the office building. It is the tenant's responsibility to lock the doors to their accommodation and to properly set the security alarm. This is to ensure the safety of individuals and property at the office building. Tenant must know the security alarm code in order to enter and exit the building.

## 1.27  ENTRANCES AND EXITS:

The tenant shall not leave open any corridor doors, exit doors or door connecting to corridors before, during, or after business hours. For security purposes and if the tenant does so, it will be at the Tenant's own risk. All corridors and halls shall not be obstructed by the tenant or used for any purpose other than egress and ingress. The tenant can only use public areas with the consent of the landlord and those areas must be kept neat and attractive at all times.

## 1.28  EMPLOYEES AND GUESTS:

The Tenant's employees and guests shall conduct themselves in a businesslike manner; proper attire shall be worn at all times; the noise level will be kept to a level so as not to interfere with other tenants and the tenant will abide by landlord's directives regarding security, keys, parking, littering and other such matters common to all occupants. No part of the office or office building may be used for overnight accommodation

## 1.29  ELECTRICAL:

The electricity shall be used for ordinary lighting, powering personal computers and small appliances only, unless written permission to do otherwise shall first have been obtained from landlord at an agreed cost to tenant. If the tenant requires any special installation or wiring for electrical use, telephone equipment or otherwise, such wiring shall be done at the tenant's expense by the personnel designated by Landlord.

## 1.30  COMMON AREAS:

Tenant may not conduct their business in the hallways, reception area or any other area except in the Tenant's designated office without the prior written consent of landlord. Tenant is to clean up after self to maintain the health and conveniences available to all Tenants this includes but not limited to microwave, refrigerator, kitchen counters, and restrooms. Cleaning is done weekly but does not include disposal of tenant's trash or cleaning of tenant's individual suite. There is a "zero tolerance" policy regarding cleaning up after one's self. Consistent unsanitary practices of tenants who leave accidents, spills, or any other common area matter will be handled on an individual basis and may even include a notice of eviction. Materials are in the common-area closet and underneath the kitchen sink to aid in cleaning any accidents that the tenant may cause.

## 1.31  ANIMALS:

The tenant shall bring no animals into the building other than certified assistant animals which are used solely for the purposes of such certification.

## 1.32  KITCHEN AMENITIES:

The kitchen sink, fridge, and counters are not to be used for anything but the preparation of beverages and food. Tenants are responsible for cleaning up after themselves so that those that follow will be able to clean surfaces. Food is not to be rinsed or dumped into the sink. Any tenant caught will be responsible for any costs incurred.

## 1.33  LOCKS:

No additional locks or bolts of any kind shall be placed upon any of the doors or windows of the office building by the tenant nor shall any changes be made to existing locks or the mechanisms thereof. Landlord must have keys to enter the leased premises according to the permitted actions under law in the event of emergencies, and to inspect the premises for maintenance, damage, and future renovations. Any key not returned at the end of your lease will be a $50 charge. In the event of a lost key, there will be a $45 charge for key replacement and lock change. Landlord reserves the right to install coded entry locks for the building compliant with the lease terms.

## 1.34  PROPERTY:

All property belonging to the tenant or any of the tenant's employee, agent or invitee shall be at the risk of such person only and Landlord shall not be liable for damages thereto or for theft or misappropriation thereof.

## 1.35  SMOKING/ALCOHOL:

The consumption of any kind of alcoholic beverage in the building premises is strictly prohibited. Smoking of any type i.e. nicotine, electronic, illegal-drug use, or any other form, shall be prohibited inside the building, including conference and training rooms. No smoking shall be permitted at any time in any area of the office building (including open or closed offices). Smoking is restricted to designated smoking zones outside of the building. (According to state law, you must be at least 20 feet away from the building)

## 1.36  ILLEGAL SUBSTANCES:

Tenant is prohibited from the use, sale, trade, or any bartering system involving illegal drug use or sales on the premises of the office building. Any violation will result in effectively termination the commercial office-space agreement between tenant and landlord.

## 1.37  TRASH:

Each tenant is responsible for carrying out their own trash to the waste receptacle outside. Tenant's office trash is not to be discarded in any of the common-area trash cans.

## 1.38  TENANT INCURRED EXPENSES:

Any additional charges incurred by the tenant, including but not limited to trash removal, citations and/or pest control will be billed to the tenant with an additional $35 for administration.

1.39  REVISIONS TO POLICIES:

Landlord may modify these policies at any time, with or without notice.

1.40  NOTICES:

Any notice required or permitted under this lease shall be deemed sufficiently given or served if sent by email to tenant's last known email address.

1.41  NOTICES TO TENANT:

should be emailed to: stevenkonan@yahoo.com

1.42  NOTICES TO LANDLORD:

should be emailed to: Accting.AFT@gmail.com.

1.43  KEYS PROVIDED:

Main Key and Suite Key

By initialing below, you acknowledge and agree to the terms in Section 1.

X   

Konan Realty and tax

# 2. Commercial Tenant Estoppel Certificate (©Texas Association of Realtors®, Inc. 2005)

2.1  THIS ESTOPPLE CERTIFICATE CONCERNS THE LEASE DESCRIBED BELOW:

Landlord:  AFT Commercial

Tenant:  Konan Realty and tax

Leased Premises:
813 Brown Trail
Bedford, TX 76022
, 3 ,

Commencement Date of Lease:  05/01/2020

2.2  TENANT CERTIFIES THAT

1. As of the date Tenant signs this certificate, neither landlord nor Tenant is in default of the lease;

2. The monthly rent to be paid through the end of the lease is as follows:  $960.00

3. The next rent payment is due 5/1/2020

4. Tenant has not paid Landlord any rent more than 30 days in advance except: na

5. Tenant deposited  $700.00  with Landlord as a security deposit under the lease:

6. As of the date Tenant signs this certificate, Tenant has no claim of offset against rent except for: na

7. The current term of the lease expires on  07/31/2021

8. Tenant has the option to renew the lease as follows: na

9. Tenant has accepted the leased premises, is in possession of the leased premises, and all improvements to the leased premises have been made;

10. Tenant has no ownership interest in the property in which the leased premises are located; and

11. Security Deposit increase of $260 payment to be split up ($65/month for 4 months). At the end of this new lease your rent, if you choose to renew, will go up by 10%, or $96. Tenant shall not be responsible for in-suite plumbing since suite shares the same drainage pipe as main bathrooms of main building and there's already Pre-existing plumbing problems in the Building, suites and main bathrooms. Agreed, however, if tenant damages something like a toilet or sink, tenant is responsible for repair/replacement.

Tenant understands that this certificate will be delivered to na and that this party(ies) is relying on the representative in this certificate.

By initialing below, you acknowledge and agree to the terms in Section 2.

X      *S K*
Konan Realty and tax

# 3. Sign and Accept

## 3.1  TENANT SIGNATURE:

Konan Realty and tax  Konan Realty and tax

X *Steven Konan*
Lessee                    IP Address: 76.85.3.67
                         04/21/2020 06:39pm CDT

X *Lucas Bessey*
Lessor                    IP Address: 47.24.110.223
                         04/21/2020 07:17pm CDT

7